STATE OF MINNESOTA

IN SUPREME COURT

A22-1688

Court of Appeals                                            Thissen, J.
                                              Took no part, Gaïtas, J.

In the Matter of the SIRS Appeal by
Best Care, LLC.

                                              Filed: October 15, 2025
                                              Office of Appellate Courts

_____

Keith Ellison, Attorney General, Benjamin Johnson, Assistant Attorney General, Saint Paul, Minnesota, for appellant/cross-respondent.

Pari I. McGarraugh, Rachel L. Dougherty, Fredrickson & Byron, P.A., Minneapolis, Minnesota, for respondent/cross-appellant.

John A. Kvinge, Matthew W. Bergeron, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, Minnesota, for amicus curiae Minnesota First Provider Alliance.

_____

S Y L L A B U S

1.      To obtain monetary recovery under Minnesota Statutes section 256B.064, subdivision 1c(a) (2022), the Minnesota Department of Human Services (DHS) must prove either (1) that a vendor engaged in conduct identified in Minnesota Statutes section 256B.064, subdivision 1a (2024), and that, had DHS known of the conduct before payment, it would have been legally prohibited from making payment based on a statute or valid regulation independent of section 256B.064, subdivision 1a; or (2) that the

1

payment resulted from an error, intentional or not, by DHS or the individual or entity submitting the claim such that the vendor received more money than authorized by law.

2.     Care plans must be maintained in the provider agency file for all Personal Care Assistant (PCA) services, including for PCA Choice recipients, under Minnesota Statutes section 256B.0659, subdivision 7(a) (2024).

Affirmed in part, reversed in part, and remanded.

O P I N I O N

THISSEN, Justice.

In this case, the Minnesota Department of Human Services (DHS) seeks over $420,000 in monetary recovery from Best Care, LLC (Best Care), a personal care assistance provider agency (PCA provider agency), because of documentation deficiencies discovered in an audit. The case requires us to resolve two questions. First, we are asked to determine the facts DHS must prove to obtain monetary recovery from an individual or entity DHS paid under Minnesota Statutes section 256B.064, subdivision 1c(a) (2022).[1] Subdivision 1c(a) allows for monetary recovery when a vendor was "improperly paid either as a result of conduct described in subdivision 1a or as a result of a vendor or department error . . . ." Minn. Stat. § 256B.064, subd. 1c(a). Under our recent decision in

---

[1]     The Legislature amended Minnesota Statutes section 256B.064 during both the 2023 and 2025 legislative sessions. Act of May 24, 2023, ch. 70, art. 17, § 44, 2023 Minn. Laws 1,551–55 (codified as amended at Minn. Stat. § 256B.064 (2024)); Minn. Stat. § 256B.064 *as amended by*, Act of May 23, 2025, ch. 38, art. 5, § 28, 2025 Minn. Laws 1, 154; Minn. Stat. § 256B.064 *as amended by*, Act of June 14, 2025, ch. 3, art. 4, § 6, 2025 Minn. Laws 1st Spec. Sess. 1, 141–42. The amendments did not affect the language at issue.

*In re SIRS Appeal by Nobility Home Health Care, Inc.*, Best Care's documentation deficiencies constitute "abuse" under Minnesota Statutes section 256B.064, subdivision 1a (2022). 999 N.W.2d 843, 864 (Minn. 2024). DHS argues that it may obtain monetary recovery because it proved Best Care engaged in abuse, which is one of the grounds for sanctions set forth in section 256B.064, subdivision 1a. Best Care argues that DHS must prove something more than engagement in abuse before obtaining monetary recovery.

We hold that for DHS to obtain monetary recovery under section 256B.064, subdivision 1c (2022), in addition to proving Best Care engaged in abuse, DHS must also prove that, had DHS known that Best Care had engaged in the conduct before payment, DHS would have been legally prohibited by a statute or valid regulation independent of section 256B.064, subdivision 1a, from making the payment. Accordingly, we remand the case to the court of appeals to address whether DHS would have been legally prohibited from paying Best Care for services it provided to its clients had DHS known before making the payments that Best Care had engaged in the precise act of "abuse" that forms the basis for DHS's monetary recovery claim.

The second issue we must decide is whether, under Minnesota Statutes section 256B.0659 (2022), Best Care must keep a copy of PCA Choice care plans in its agency files, or whether it is sufficient for a copy of each PCA Choice recipient's care plan to be kept in the recipient's home.[2] We conclude that statute requires that PCA provider

---

[2]     As described below, *see infra* at 4–5, PCA Choice is "an option of the [PCA] program" that provides PCA recipients with more control and autonomy in directing their care than they would have under the general personal care assistance program. *See* Minn. Stat. § 256B.0659, subd. 18(b).

agencies store care plans in both the agencies' files and each recipient's home, even if a recipient opts into the PCA Choice program. Best Care's failure to maintain PCA Choice care plans in its files was therefore abuse.

**FACTS**

Best Care is a PCA provider agency under Minnesota's Medicaid program. In 2020, DHS investigated Best Care for recordkeeping errors, which DHS claimed constituted abuse and for which DHS sought monetary recovery. We begin with an overview of Minnesota's Medicaid program, DHS's investigation, and the procedural history of DHS's attempt to recover payments from Best Care.

### *Minnesota's Medicaid Program*

Medicaid was enacted in 1965 as Title XIX of the Social Security Act to provide medical care to those who otherwise could not afford it. 42 C.F.R. § 430.0; *see Martin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 9 (Minn. 2002). "Medicaid is set up as a 'cooperative' payment agreement between states and the federal government . . . ." *In re Est. of Ecklund*, 20 N.W.3d 351, 353 (Minn. 2025). Medical Assistance is Minnesota's Medicaid program. Minn. Stat. §§ 256B.01 (2024), 256B.22 (2024). Because Minnesota opted in to the federal Medicaid program, Medical Assistance must comply with federal law. 42 U.S.C. § 1396c; *Ecklund*, 20 N.W.3d at 353; *see also* Minn. Stat. § 256B.22 (2024) (stating that Minnesota's Medical Assistance program is "intended to comply with and give effect to the program set out in title XIX of the federal Social Security Act").

Under Medical Assistance, DHS reimburses vendors who provide medical services to Medical Assistance recipients. Minn. Stat. § 256B.041 (2024). Medical Assistance has

4

one year from discovering any overpayment to recover the excess before the federal government reduces its payments to the state on account of the overpayment. 42 U.S.C. § 1396b(d)(2)(C). To monitor the accuracy of vendor payments, DHS has a Surveillance and Integrity Review Section (SIRS), which conducts audits and investigations into suspected noncompliance with program requirements.

PCA provider agencies are among the vendors who provide medical services to Medical Assistance recipients. Personal care assistants (PCAs) assist individuals who otherwise may need advanced or institutionalized care in daily tasks and health-related activities to promote their safety and independence. *See* Minn. Stat. § 256B.0659, subd. 2 (listing the types of PCA services covered under Medical Assistance). Under Minnesota's traditional PCA program, PCA provider agencies develop care plans and arrange PCAs to deliver services to Medical Assistance recipients. *See id.*, subds. 1(l), (n) (2022), 11(a)(2). Another program, the PCA Choice program, gives recipients greater control over and choice in their care by allowing them to develop their care plans and "be responsible for . . . hiring, training, scheduling, and firing" PCAs. *Id.*, subds. 18(b), 19(a)(2). Under PCA Choice, a PCA provider agency acts as a "fiscal intermediary," managing responsibilities like payroll, billing the state, taxes, some training, and other management support. *Id.*, subd. 18(b). "Unless otherwise provided," PCA Choice follows the traditional PCA requirements outlined in section 256B.0659. *Id.*, subd. 18(a). Best Care is a PCA provider agency that serves recipients in traditional PCA programs as well as PCA Choice.

PCA provider agencies must properly maintain and keep health service records. Minn. R. 9505.2175, subp. 1 (2025). A health service record is defined as "documentation

of the health service that is electronically stored, written, or diagrammed that indicates the nature, extent, and evidence of the medical necessity of a health service provided by a vendor and billed to a program." Minn. R. 9505.2165, subp. 6 (2025). Timesheets and care plans are health service records. Minn. R. 9505.2175, subp. 2.C, .G (2025); *see also* Minn. Stat. § 256B.0659, subds. 28(a)(2)(iv), (4) (requiring PCA provider agencies to keep care plans and timesheets).

A personal assistance care plan is a written description of PCA services which the PCA provider develops according to a service plan. Minn. Stat. § 256B.0659, subd. 1(n). A service plan is "a written summary of the assessment and description of the services needed by the recipient." *Id.*, subd. 1(q). A care plan describes the eligible services available to a specific recipient based on a county-administered authorization. *Id.*, subds. 3a, 4, 6, 7.

Each individual PCA is required to record their daily activities on a timesheet, which must "correspond to the personal care assistance care plan." *Id.*, subd. 12(b). This timesheet must include the recipient's name and identifying information; the recipient's or responsible party's signature; the PCA provider agency's name and contact information; service dates and times, including arrival and departure times with a.m. or p.m. designations; any designations of shared care; and the PCA's name, identifying number, and signature. *Id.*, subd. 12(c). Minnesota statutes and rules require PCA provider agencies to document each health service provided to a recipient and Minnesota rules designate such documentation a "condition for payment." Minn. R. 9505.2175, subp. 1 (2025); Minn. Stat. § 256B.0659, subd. 12(a).

*The Investigation*

In response to complaints, SIRS began an investigation into Best Care in early 2020. SIRS conducted post-payment review of claims Best Care submitted between September 2018 and December 2018. In its investigation, DHS identified nine categories of conduct related to recordkeeping errors which it claimed constituted abuse under section 256B.064, subdivision 1a, and sought monetary recovery of the amounts DHS paid Best Care in connection with the service records at issue. Best Care conceded that three categories constituted abuse and agreed to return $5,046 to DHS. Best Care disputed whether DHS could obtain monetary recovery for the other six categories of abuse alleged. Best Care does not deny its records were imperfect. Similarly, DHS does not claim Best Care's documentation deficiencies were fraudulent or that Best Care necessarily billed for services it did not provide. We briefly review the six disputed categories of errors.

Abuse Categories 1 and 2: Missing Documentation. The SIRS investigation found that Best Care did not have current care plans in its files for thirteen recipients, some of whom were PCA Choice recipients.[3] DHS seeks monetary recovery for all claims billed for these recipients during the investigation period.

In addition, Best Care failed to deliver 69 timesheets in response to the SIRS investigation. DHS seeks monetary recovery for the services reflected on those timesheets under the abuse category of missing documentation. *See* Minn. Stat. § 256B.0659, subds. 12(a) (requiring timesheets to be kept in a recipient's health record), 28(a)(4) (listing

---

[3] The parties dispute whether Minnesota law requires that Best Care retain copies of care plans for PCA Choice recipients in its files. We address this question in Part II.

7

timesheets as required documentation for PCA provider agencies). Upon notice of overpayment, Best Care went through its backup system and found that the 69 timesheets had been inadvertently deleted. It was able to restore the timesheets and submitted them to DHS during the appeal process. DHS nonetheless seeks monetary recovery for the "missing" timesheets, claiming they were not timely produced and thus that the amounts paid for services listed on those timesheets are recoverable.

Abuse Category 3: Care Plans Missing Required Elements. The SIRS investigation found that some of the care plans in Best Care's files were incomplete or improper. Minnesota Statutes section 256B.0659, subdivision 7, sets forth the requirements for a care plan. A care plan must be signed by the recipient or responsible party (an agent of the recipient) before or within the first week of receiving care services. *Id.*, subd. 7(b)(6), (c). Some of Best Care's care plans DHS flagged in this category had untimely recipient signatures, meaning the recipients signed the care plans more than a week after services started. One of the care plans with an untimely signature was also missing a required phone number. *See id.*, subd. 7(b)(2) (requiring care plans to contain the recipient's phone number). Finally, one recipient's care plan lacked the required responsible party's signature. DHS seeks monetary recovery for payments made while the care plans were out of compliance with the statute.

Abuse Categories 4 and 5: Timesheets Missing Required Elements or Altered After Service. The SIRS team also identified timesheets that lacked required elements. These timesheet errors included incorrect a.m. or p.m. designations, failure to include Best Care's name or phone number, illegible time in or out entries, and missing Unique Minnesota

8

Provider Identifier (UMPI) numbers. *See* Minn. Stat. § 256B.0659, subd. 12(c) (listing the required elements for timesheets). DHS seeks monetary recovery of the payments corresponding to the services recorded on these timesheets. DHS also alleged that some PCA signatures on timesheets were photocopied, and seeks recovery related to those timesheets.

The most frequent timesheet error for this category was missing UMPI numbers. DHS assigns each PCA in Minnesota a unique identification number. Timesheets must include these numbers. Minn. Stat. § 256B.0659, subd. 12(c)(1). Receiving a UMPI number, however, can take several months. According to a DHS employee's testimony at the contested case hearing, DHS policies allow a newly hired PCA to provide services while they wait for their UMPI number, but DHS cannot reimburse a claim for services that PCA provides until the number is assigned. Therefore, Best Care paid newly hired PCAs out of its own pocket while it waited for them to be assigned UMPI numbers. During this time, the PCAs completed timesheets, but those timesheets understandably did not include UMPI numbers. When DHS assigned the new PCAs UMPI numbers, Best Care submitted back-logged reimbursement claims to DHS. In some cases, the timesheets supporting those claims were not amended to include the UMPI numbers—i.e., the UMPI number section was submitted blank. In other cases, PCAs altered their timesheets by covering notations of "No UMPI yet" with the UMPI numbers they subsequently received.

The PCAs who completed the timesheets the SIRS's audit flagged for lacking UMPI numbers had applied for—but had not yet been issued—UMPI numbers. Thus, DHS seeks recovery for payments made for all timesheets with missing UMPI numbers, even though

9

they were missing because DHS had not yet issued those numbers. DHS also seeks to recover overpayments for services PCAs recorded on their timesheets without UMPI numbers, but which they later "altered" by filling in their UMPI numbers after DHS assigned them.[4]

Abuse Category 6: Shared Service Designations. Finally, the SIRS investigation found, and DHS seeks to recover, overpayments related to timesheets that incorrectly recorded shared service of one PCA to three recipients (1:3) as providing one-to-one care (1:1). Best Care asserts that since shared services were not authorized for any of the recipients connected to the inaccurate timesheets, the PCAs mistakenly circled the shared service category on those timesheets. DHS does not allege it was billed for the wrong ratios, but that the discrepancy is abuse that is recoverable under the statute.[5]

### Procedural History

On September 16, 2020, SIRS served a notice of overpayment on Best Care, stating that DHS intended to recover $446,290 based on documentation deficiencies discovered during the SIRS investigation. Best Care conceded that DHS could recover approximately $5,000 in overlapping claims but disputed the rest. DHS twice amended the notice of

---

[4]   We note that DHS's actions here create a lose-lose situation. According to the DHS employee's testimony, DHS allows PCAs to provide services to recipients before receiving a UMPI number, but, when the PCA provider agency submits the backlogged claims for reimbursement, DHS asserts it can recover any payments made for the recorded services because the later-submitted timesheets either lack a UMPI or have been "altered."

[5]   Best Care points out that shared care is billed at a higher reimbursement rate than 1:1 care. This means that even if the timesheet notations were not mistakes and the PCAs had provided shared care, DHS paid *less* than it would have had the services been properly billed.

overpayment to correct errors in its evaluation. The first amended notice added new grounds for its claim, but left the recovery amount the same; the second reduced the recovery amount to $428,393. This is the amount currently in dispute.

Best Care sought review of DHS's recovery claim. As to abuse categories 1 and 2 regarding missing documentation, an administrative law judge (ALJ) held an evidentiary hearing and issued a report recommending that DHS was entitled to monetary recovery for the missing traditional PCA recipients' care plans "to the extent that [those] recipients lacked care plans," but did not allow recovery for the missing PCA Choice care plans. The ALJ also determined that DHS could not recover overpayment for the 69 timesheets because they were not, in fact, missing. As to the remaining contested abuse categories, the ALJ concluded that DHS was not entitled to monetary recovery for the other document deficiencies, in part because DHS did not prove that the deficiencies resulted in "improper payment" as required under section 256B.064, subdivision 1c(a).

In her review, DHS's Commissioner (the Commissioner) rejected the ALJ's recommendation regarding the 69 missing timesheets and ordered repayment, stating that the timesheets were not timely produced. The Commissioner cited Minn. R. 9505.2185, subp. 2 (2025), for the proposition that failure to turn over the timesheets was a failure to "grant the department access . . . to examine health service and financial records related to a health service billed to [Medical Assistance]." *See* Minn. Stat. § 256B.0659, subd. 31 (also requiring access to records as part of an overpayment investigation). The Commissioner further rejected the ALJ's recommendations requiring DHS to prove

improper payment in the other abuse categories and reinstated the full monetary recovery amount.

Best Care appealed and the court of appeals reversed the Commissioner's decision. *In re SIRS Appeal by Best Care, LLC.*, 994 N.W.2d 333, 345–46 (Minn. App. 2023). The court of appeals concluded that DHS must prove not only that Best Care engaged in conduct that constitutes "abuse" under section 256B.064, subdivision 1a, but also that the abusive conduct resulted in improper payment, "i.e., Best Care receiving funds in excess of what they were entitled to receive." *Best Care*, 994 N.W.2d at 342–43. Concluding DHS failed to prove that any of the six error categories resulted in improper payment, the court of appeals remanded to the Commissioner to enter a revised order. *Id.* at 345.

The court of appeals also addressed whether Best Care was required to maintain care plans for PCA Choice recipients, or only traditional PCA care plans, in its files. *Id.* at 344. Relying on its opinion *In re SIRS Appeal by 1 Best Care, Inc.*, No. A20-0904, 2021 WL 1245294, at *4 (Minn. App. Apr. 5, 2021), which held that traditional and PCA Choice care plans are "bound by the same requirements," the court of appeals determined that PCA provider agencies must maintain both types of care plans in their files. *Best Care*, 994 N.W.2d at 344.

DHS petitioned for review of the court of appeals' decision that section 256B.064, subdivision 1c(a), requires DHS to prove both subdivision 1a conduct or error and, separately, that such abuse also caused a vendor to be improperly paid for services that were not actually provided in order to recover payments. Best Care sought review of the

courts of appeals' decision that PCA provider agencies must keep PCA Choice care plans in their files. We granted review of both issues.

## ANALYSIS

In this case, we address two issues: (1) what DHS must prove to obtain monetary recovery under section 256B.064, subdivision 1c(a); and (2) whether a PCA provider agency must retain care plans for PCA Choice clients in its files. Both issues were initially resolved in an administrative law proceeding under Minnesota Statutes chapter 14 (2022), and Best Care appealed to the court of appeals from the Commissioner's final order affirming monetary recovery.

Under the judicial-review provisions of the Minnesota Administrative Procedure Act, a reviewing court may affirm the Commissioner or remand for further proceedings. Minn. Stat. § 14.69 (2024). The court may also reverse or modify the Commissioner's decision if DHS's findings, inferences, conclusions, or decisions are:

> (a) in violation of constitutional provisions; or
> (b) in excess of the statutory authority or jurisdiction of the agency; or
> (c) made upon unlawful procedure; or
> (d) affected by other error of law; or
> (e) unsupported by substantial evidence in view of the entire record as submitted; or
> (f) arbitrary or capricious.

*Id.*

Both issues before us turn on the meaning of Minnesota statutes, which we review de novo. *Nobility*, 999 N.W.2d at 851. Our goal in interpreting statutes is to ascertain and effectuate the Legislature's intent. *Wocelka v. State*, 9 N.W.3d 390, 394 (Minn. 2024). If that intent is plain from the text and context of the statute—that is, there is only one

13

reasonable interpretation of the language—we then adopt that meaning. *Nobility*, 999 N.W.2d at 855. If, however, there is more than one reasonable interpretation, then the statute is considered ambiguous, and we may apply various rules of construction to determine its meaning. *Wocelka*, 9 N.W.3d at 399; Minn. Stat. § 645.16 (2024).

I.

We first address the circumstances under which monetary recovery for recordkeeping abuses is proper. Monetary recovery is a mechanism that allows DHS to reclaim payments made to a vendor under certain circumstances. Minnesota Statutes section 256B.064, subdivision 1c, governs monetary recovery. The statute reads:

> (a) *The commissioner may obtain monetary recovery from a vendor who has been improperly paid either as a result of conduct described in subdivision 1a or as a result of a vendor or department error, regardless of whether the error was intentional.* Patterns need not be proven as a precondition to monetary recovery of erroneous or false claims, duplicate claims, claims for services not medically necessary, or claims based on false statements.

> (b) The commissioner may obtain monetary recovery using methods including but not limited to the following: assessing and recovering money improperly paid and debiting from future payments any money improperly paid. The commissioner shall charge interest on money to be recovered if the recovery is to be made by installment payments or debits, except when the monetary recovery is of an overpayment that resulted from a department error. The interest charged shall be the rate established by the commissioner of revenue under section 270C.40.

Minn. Stat. § 256B.064, subd. 1c (emphasis added). The "conduct described in subdivision 1a"—which subdivision 1c cites as one of two bases for monetary recovery—includes eight enumerated grounds for sanctions, including "abuse."[6] *Id.*, subd. 1a.

In this case, DHS determined that Best Care failed to maintain health records as required by law in several ways (the six categories of errors identified in the Facts section). In *Nobility*, we held generally that "failure to maintain health service records as required by law" is abuse under Minnesota Statutes section 256B.064, subdivision 1a(1).

---

[6]     Section 256B.064, subdivision 1a(a), provides:

The commissioner may impose sanctions against a vendor of medical care for any of the following:

> (1) fraud, theft, or abuse in connection with the provision of medical care to recipients of public assistance;
> (2) a pattern of presentment of false or duplicate claims or claims for services not medically necessary;
> (3) a pattern of making false statements of material facts for the purpose of obtaining greater compensation than that to which the vendor is legally entitled;
> (4) suspension or termination as a Medicare vendor;
> (5) refusal to grant the state agency access during regular business hours to examine all records necessary to disclose the extent of services provided to program recipients and appropriateness of claims for payment;
> (6) failure to repay an overpayment or a fine finally established under this section;
> (7) failure to correct errors in the maintenance of health service or financial records for which a fine was imposed or after issuance of a warning by the commissioner; and
> (8) any reason for which a vendor could be excluded from participation in the Medicare program under section 1128, 1128A, or 1866(b)(2) of the Social Security Act.

Minn. Stat. § 256B.064, subd. 1a(a).

15

999 N.W.2d at 864. We left unanswered, however, whether a finding of abuse under subdivision 1a(1) is sufficient to allow DHS to obtain monetary recovery under section 256B.064, subdivision 1c(a), or whether DHS must, in addition, establish that a vendor was "improperly paid" because of this abuse. *Nobility*, 999 N.W.2d at 864. We now turn to that question.

A.

We start with DHS's contention that to obtain monetary recovery it must only prove that a vendor engaged in subdivision 1a conduct or error. As in all statutory interpretation questions, we begin with the text, which provides: "The commissioner may obtain monetary recovery from a vendor who has been improperly paid either as a result of conduct described in subdivision 1a or as a result of a vendor or department error, regardless of whether the error was intentional." Minn. Stat. § 256B.064, subd. 1c(a).

On its face, the language of subdivision 1c requires proof of something beyond the mere existence of proscribed conduct or error. The provision includes a causation element—improper payment must be made "as a result of" the subdivision 1a conduct or error. That is, DHS must prove two distinct circumstances to obtain monetary recovery: (1) that a vendor engaged in subdivision 1a conduct or that an error occurred, and (2) that the vendor has been "improperly paid . . . as a result of" the conduct or error. This is a reasonable reading of the words in subdivision 1c.

DHS disagrees, asserting the words "improperly paid" is merely descriptive and suggesting that the phrase refers to the fact that payments made to a vendor that has engaged in subdivision 1a conduct is "improper" and, thus, recoverable. Essentially, DHS

16

asks us to read subdivision 1c to mean "[t]he commissioner may obtain monetary recovery from a vendor *for* conduct described in subdivision 1a or vendor or department error." But that is not what the statute says. DHS's interpretation impermissibly eliminates the words "as a result of" from the statute. *See State v. Thompson*, 950 N.W.2d 65, 69 (Minn. 2020) (applying the canon against surplusage, which provides that statutes should be interpreted to "ensure[] each word in a statute is given effect"). The statute's plain language requires something beyond mere evidence of proscribed conduct or error to obtain monetary recovery.

DHS also relies on other provisions in section 256B.064 (2022) to support its position that monetary recovery is allowed solely upon proof that subdivision 1a conduct or an error occurred. Specifically, DHS relies upon subdivisions 1a(a)(6), 3(d), and 5(a). It asserts that each of these provisions allows DHS to recover payments upon proof of certain conduct—that is, without proving a separate causation element—and urges us to interpret subdivision 1c similarly. We are not persuaded.

Section 256B.064, subdivisions 1a(a)(6) and 5(a), provide no insight into how to interpret the monetary recovery provision in section 256B.064, subdivision 1c(a). Subdivision 1a(a)(6) states that a vendor who fails to repay an overpayment or a fine imposed under section 256B.064 is subject to sanctions (and also monetary recovery under subdivision 1c). Minn. Stat. § 256B.064, subd. 1a(a)(6).[7] And subdivision 5(a) states that

---

[7] Section 256B.064, subdivision 1a(a)(6), states that "[t]he commissioner may impose sanctions against a vendor of medical care for . . . failure to repay an overpayment or a fine finally established under this section."

17

a vendor who has been improperly paid remains responsible for any overpayments even if the vendor made a good faith report of misconduct. Minn. Stat. § 256B.064, subd. 5(a).[8] The problem with DHS's reliance on these provisions is that each provision assumes the vendor is *already* subject to monetary recovery. The cited provisions tell us nothing about the requirements to *prove* that a vendor is subject to monetary recovery—the question we must answer.

The final provision DHS relies on—section 256B.064, subdivision 3(d)—requires a vendor to "refund" DHS for any amounts the vendor paid to another vendor who has been suspended or terminated from receiving payment from Medicaid funds.[9] DHS points to this subdivision as evidence that the Legislature intended non-causal recovery in section 256B.064, since it requires automatic reimbursement by the vendor. That one

---

[8]     Section 256B.064, subdivision 5(a), provides that "[a] person who makes a good faith report is immune from any civil or criminal liability that might otherwise arise from reporting or participating in the investigation. Nothing in this subdivision affects a vendor's responsibility for an overpayment established under this subdivision."

[9]     Section 256B.064, subdivision 3(d), provides:

> A vendor that pays medical assistance program funds to an individual or entity on the exclusion list must refund any payment related to either items or services rendered by an individual or entity on the exclusion list from the date the individual or entity is first paid or the date the individual or entity is placed on the exclusion list, whichever is later, and a vendor may be subject to:
>
> (1) sanctions under subdivision 2;
> (2) a civil monetary penalty of up to $25,000 for each determination by the department that the vendor employed or contracted with an individual or entity on the exclusion list; and
> (3) other fines or penalties allowed by law.

provision in section 256B.064 may require automatic reimbursement does not mean that every provision in the section does so. Indeed, comparing subdivision 3(d)'s and subdivision 1c(a)'s requirements is inappropriate because subdivision 3(d)'s reimbursement requirement does not contain the causal language included in subdivision 1c(a). If anything, the lack of causal language in subdivision 3(d) convinces us the Legislature intended the phrase "improperly paid . . . as a result of" in subdivision 1c to be given independent meaning. *See Cambria Co., LLC v. M&M Creative Laminants, Inc.*, 11 N.W.3d 318, 324 (Minn. 2024) (explaining that "[w]hen the Legislature uses limiting or modifying language in one part of a statute, but omits it in another" we view the omission as intentional and do not infer "those same words of limitation or modification to parts of the statute where they were not used." (citation omitted) (internal quotation marks omitted)).[10]

The structure of section 256B.064 reinforces our interpretation. *See Hagen v. Steven Scott Mgmt., Inc.*, 963 N.W.2d 164, 170 (Minn. 2021) (stating that, in interpreting a statute for ambiguity, we evaluate "the statute's text, structure, and punctuation" (citation modified)). Comparing the provisions for monetary recovery under subdivision 1c to the grounds for sanctions under subdivisions 1a and 1b makes clear that subdivision 1c

---

[10] In a similar vein, DHS argues that our reading impermissibly restrains DHS's monetary recovery authority. It argues that if the Legislature had wanted to restrict DHS's authority, it would have done so explicitly, citing section 256B.064, subdivisions 1(d) and 1c(b), as evidence of the Legislature expressly restricting DHS's recovery authority. DHS's argument ignores that the Legislature *did* apply an additional element to subdivision 1c(a) by including the phrase "improperly paid . . . as a result of" conduct or error in the subdivision. Minn. Stat. § 256B.064, subd. 1c(a).

imposes unique requirements. Subdivision 1a provides that DHS "may impose sanctions" for eight categories of conduct. Minn. Stat. § 256B.064, subd. 1a(a). The language is discretionary and non-causal, requiring nothing more than proof that the proscribed conduct occurred for DHS to seek sanctions. Subdivision 1b builds off subdivision 1a. It describes the factors that DHS must consider when deciding the sanction to impose: "When imposing sanctions under this section, the commissioner shall consider the nature, chronicity, or severity of the conduct and the effect of the conduct on the health and safety of persons served by the vendor." Minn. Stat. § 256B.064, subd. 1b. Subdivision 1b also contemplates different consequences than monetary recovery, such as terminating participation in the Medical Assistance program. *Id.* The list of factors constrains DHS's discretion in deciding the sanction to pursue, but as with subdivision 1a, subdivision 1b does not include language requiring the sanction for inappropriate conduct to manifest in a particular result. Sanctions, under subdivisions 1a and 1b, are direct responses to proscribed conduct.

Subdivision 1c authorizes DHS to pursue a different action when a vendor engages in proscribed conduct for which payment is prohibited or when the vendor requests payment for, or DHS pays, a claim by error. *See Nobility*, 999 N.W.2d at 854 (stating that monetary recovery under subdivision 1c is not a sanction under subdivisions 1a and 1b). DHS may obtain monetary recovery when the vendor was "improperly paid . . . as a result of" the sanctionable conduct or error. Minn. Stat. § 256B.064, subd. 1c. The "improperly paid . . . as a result of" language is explicit in and unique to subdivision 1c, and limits when DHS may seek monetary recovery. That is, monetary recovery is available only when DHS

20

can prove that the sanctionable conduct or error by DHS or the vendor *caused* an improper payment. Further, subdivision 1c requires that the misconduct or error result in an improper payment—which is not a condition to impose sanctions. The structural and requirement differences between the sanction provisions (which allow for imposing sanctions when individuals and entities engage in certain conduct) and the monetary recovery provision (which requires that the prohibited conduct result in an improper payment) support our conclusion that, to obtain monetary recovery under subdivision 1c, DHS must prove more than the occurrence of subdivision 1a conduct or error.[11]

In summary, we conclude that the plain language of section 256B.064, subdivision 1c, does not support DHS's position that it is entitled to monetary recovery from a vendor solely upon proving conduct specified in section 256B.064, subdivision 1a, or payment. Rather, DHS must also prove it improperly paid the vendor as a result of the conduct or error.

---

[11] DHS also suggests that interpreting subdivision 1c to require DHS to prove causation in addition to subdivision 1a conduct cannot be correct because monetary recovery would have a *higher* burden of proof than sanctions, even though sanctions can be more drastic (such as termination from the program). We find this argument without merit. Sanctions and monetary recovery serve distinct purposes and are not interchangeable. *Nobility*, 999 N.W.2d at 854 (stating that is incorrect to characterize an overpayment as a sanction). Accordingly, it is not absurd or unreasonable that the burden for imposing a sanction differs from the burden for obtaining monetary recovery. Nor are we convinced that because sanctions require one element (proscribed conduct), evaluated under a balancing test, and monetary recovery requires two (conduct or error and improper payment as a result of the conduct or error), that the burden to seek monetary recovery is inherently higher. It is simply different. *See supra* at 19–20.

21

B.

We now turn to the question of what DHS must show to establish that it improperly paid a vendor as a result of proscribed conduct or error. To do so, we assess what "improperly paid . . . as a result of" means in section 256B.064, subdivision 1c. The Legislature did not define this phrase or its component parts, so we consider other sources and canons to determine its ordinary meaning. *See Nobility*, 999 N.W.2d at 856–57.

DHS argues that a vendor is "improperly paid" when it is "incorrectly paid," a term which encompasses any payments made when the vendor engages in proscribed subdivision 1a conduct. DHS cites three dictionary definitions to support the position that "improper" means incorrect, unsuitable, or inconsistent with the facts.[12] *Improper*, *Black's Law Dictionary* (11th ed. 2019) (defining "improper" as "incorrect; unsuitable or irregular"); *Merriam-Webster Online Dictionary* (defining "improper" as "not suited to the circumstances, design, or end"); *The American Heritage College Dictionary* 697 (4th ed. 2002) (defining "improper" as "[n]ot suited to circumstances or needs; unsuitable" and "[n]ot consistent with established truth, fact, or rule; incorrect"). DHS argues that these definitions show it can recover payments when they generally "should not have been paid." The problem with relying on these definitions is that the terms "incorrect" and "unsuitable" tell us no more than the term "improper" in determining when a payment "should not have been paid." *See Ecklund*, 20 N.W.3d at 357 n.6 (stating that "[r]eplacing the words the

---

[12] In its briefing, DHS also points to other phrases in section 256B.064 that it argues shows "improper" means "incorrect." For the same reason above—namely, "incorrect" does not tell us anything more than "improper" for purposes of statutory interpretation—we find these arguments unpersuasive.

22

Legislature used . . . with other [similar] possibilities . . . sheds no light on—and is not particularly helpful in resolving—the question before us").  Furthermore, DHS's proffered interpretation of "improperly paid" would lead to subdivision 1c effectively meaning what we have just rejected: that monetary recovery is available solely upon DHS having proven subdivision 1a conduct.

The court of appeals, in its opinion, recognized this error in DHS's reasoning and concluded "that 'improperly paid' is a distinct element that must be shown in addition to 'abuse.' " *Best Care*, 994 N.W.2d at 343.  The court of appeals, however, did not explicitly define the phrase "improperly paid," but offered "billing for non-medically necessary services," being "reimbursed at a greater amount than the value of the PCA services actually delivered," and "provid[ing] unnecessary services to a recipient" as non-exclusive examples of improper payment.  *Id.*  Best Care, in turn, takes the court of appeals' analysis further, arguing that the proper focus is upon the full phrase allowing recovery when a vendor is "improperly paid . . . as a result of" certain conduct constituting abuse, and arguing that this phrase means DHS must prove the "abuse" was material to payment.

We agree with Best Care that the proper focus in analyzing the statute is upon the meaning of the whole phrase "improperly paid . . . as a result of" certain conduct.  But we conclude that to assess whether a vendor has been "improperly paid . . . as a result of" certain conduct solely on whether the vendor "received funds in excess of what they were entitled to receive," as the court of appeals suggested, *see Best Care*, 994 N.W.2d at

23

342–43, is insufficiently precise.[13]  On the other hand, we acknowledge that the court of appeals was on to something in its examples.  The through-line of the court of appeals' examples is that a vendor is improperly paid when DHS pays it for something DHS was not authorized to pay consistent with the law at the time it made the payment.  In other words, to establish that "a vendor . . . has been improperly paid . . . as a result of conduct described in subdivision 1a," DHS must prove that, had it known before making a payment that the vendor had engaged in prohibited subdivision 1a conduct, DHS would have been legally prohibited from paying.

Interpreting "improperly paid . . . as a result of" in this way is consistent with the structure and text of subdivision 1c.  The event that renders a vendor subject to monetary recovery is not the subdivision 1a conduct itself, but the vendor's receipt of a payment that should never have been made *because* the vendor engaged in the precise subdivision 1a conduct.  Notably, this interpretation accounts for the temporal aspect of the text: subdivision 1c's central verb—"paid"—is in the past tense.  *See State v. Schmid*, 859 N.W.2d 816, 820 (Minn. 2015) (noting that "a legislature's use of a verb tense is significant in construing statutes" and "different tenses exist to express differences in the time or duration of an action" (citation omitted) (internal quotation marks omitted)).  It logically flows that when deciding whether a past payment was proper or improper, the central question is whether the payment should have been made in the first place.  And for

---

[13]  We also conclude that what Best Care now characterizes as a materiality requirement does not properly focus the inquiry.  And because we are not adopting a proportionality or materiality test as Best Care proposes, we need not address DHS's arguments against such an interpretation.

our purposes—and the role monetary recovery serves in the statute—the answer to that question depends on whether statutes or valid regulations prohibited DHS from paying a vendor because of the vendor's conduct. That is because if the statutes or regulations did *not* prohibit DHS from paying a vendor at the time the payment was made, then it necessarily follows that if the vendor was paid, the vendor was not "*improperly paid . . . as a result of*" that conduct.

Further, consistent with our conclusion in Part I.A, the law that renders payment improper—the law that specified that DHS was not authorized to make a payment at the time it was made—must be distinct from and located outside of section 256B.064, subdivision 1a. DHS must identify some other independent statute or valid regulation that prohibited the payment at the time it was made. Any other interpretation would be circular and fail to give meaning to the temporal aspect—and all parts—of section 256B.064, subdivision 1c.

Under section 256B.064, subdivision 1c, then, monetary recovery of a payment is triggered only if (1) the vendor engaged in conduct set forth in section 256B.064, subdivision 1a, and, at the time DHS made the payment which DHS seeks to recover, DHS was not authorized to make the payment because a statute or regulation other than section 256B.064, subdivision 1a, prohibited the payment; or (2) the payment resulted

from vendor or department error such that the vendor received more money than authorized.[14]

This is a reasonable and workable definition that gives effect to all portions of the statute. *See Allan v. R.D. Offutt Co.*, 869 N.W.2d 31, 33 (Minn. 2015) (noting that we "give effect to all of [the statute's] provisions; no word, phrase, or sentence should be deemed superfluous, void, or insignificant" (alternation in original) (citation omitted) (internal quotation marks omitted)). As a practical matter, under this interpretation subdivision 1c would operate such that, if a vendor legitimately sought payment of $25,000, but DHS accidentally transposed the numbers resulting in a payment of $52,000, it would be unreasonable to assume DHS could recover all $52,000.[15] Instead, DHS could recover the $27,000 to which the vendor was not legally entitled.

Because our interpretation of "improperly paid . . . as a result of" differs from the meaning the court of appeals applied, we remand to the court of appeals to apply our new interpretation. Specifically, we remand to the court of appeals to determine whether DHS would have been legally prohibited from making a payment to Best Care had DHS known

---

[14] Because we conclude that this is the only reasonable interpretation of section 256B.064, subdivision 1c, we do not address any of the parties' post-ambiguity arguments. *See Nobility*, 999 N.W.2d at 855 ("It is axiomatic that when the language of a statute is unambiguous, we apply the plain language.").

[15] At oral argument, counsel for DHS agreed—at least in part—that in this hypothetical DHS's interpretation of subdivision 1c would give DHS the authority to recover all $52,000 because the payment was DHS's error (and thus "improper"), but asserted that DHS could exercise discretion on whether to do so. Under this argument, if DHS erroneously paid every vendor $1 more than was due in every case, it could (we are not suggesting that it would) then recover the full amount of all of its payments. That does not make sense to us as a matter of legislative intent or, perhaps, constitutional law.

about the specific acts of "abuse" that Best Care committed before making the payment. Further, consistent with our opinion, the legal prohibition at the time of payment must have arisen from a source of law other than section 256B.064, subdivision 1a, itself.

## II.

We move to the second question before us regarding DHS's claim that Best Care committed abuse by failing to maintain health service records as required by law: Does Minnesota Statutes section 256B.0659 require Best Care to keep copies of PCA Choice care plans in its files?[16] *See Nobility*, 999 N.W.2d at 864 (holding that "abuse" as used in subdivision 1a "encompasses failure to maintain health service records as required by law"). Section 256B.0659, in subdivisions 7(a) and 28, appears to give PCA care providers conflicting directions about whether they must maintain care plans in their files. Section 256B.0659, subdivision 7(a), states that PCA provider agencies must keep care plans in their files:

> Each recipient must have a current personal care assistance care plan based on the service plan in subdivision 6 that is developed by the qualified professional with the recipient and responsible party. A copy of the most current personal care assistance care plan *is required to be in the recipient's home* **and** *in the recipient's file at the provider agency*.

---

[16] We recognize that in October 2024, DHS began transitioning the PCA program to the Community First Services and Supports program, found in Minnesota Statutes section 256B.85 (2024), and that eventually the inconsistencies in section 256B.0659 discussed at length here may be obsolete. *See Minn. Dep't of Hum. Servs.*, *Transition from PCA and CSG to CFSS* [opinion attachment]; https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION &RevisionSelectionMethod=LatestReleased&dDocName=cfss-000102 (last visited Oct. 13, 2025).

27

Minn. Stat. § 256B.0659, subd. 7(a) (emphasis added).

In contrast, section 256B.0659, subdivision 28, provides: "*Required documentation must be completed and kept in the personal care assistance provider agency file **or** the recipient's home residence.*  The required documentation consists of: . . . recipient files, including: . . . personal care assistance care plan . . . ."  Minn. Stat. § 256B.0659, subd. 28(a)(2)(iv) (emphasis added).  Under this provision, Best Care need not keep care plans in its files if plans are kept at recipients' home residences.

Because the language of these two subdivisions directly conflict, we first consider whether we can harmonize these provisions.  If we cannot, we must resolve the conflict between them.

A.

The language of subdivisions 7(a) and 28 directly conflict.  In such circumstances, we first seek to harmonize conflicting provisions in the law, if possible.  *State by Smart Growth Minneapolis v. City of Minneapolis*, 954 N.W.2d 584, 590–91 (Minn. 2021); *see also Daniel v. City of Minneapolis*, 923 N.W.2d 637, 650–51 (Minn. 2019) (holding two statutes with exclusivity provisions could be harmonized, even when they concerned the same conduct, because they addressed different resulting injuries).  But determining whether two statutes are in conflict is itself a matter of statutory interpretation, and we cannot unreasonably twist the language of either statute to avoid a conflict.  *See State by Smart Growth*, 954 N.W.2d at 590 (observing that determining whether two statutes conflict is a matter of statutory interpretation); *Antonin Scalia & Bryan A. Garner*, *Reading Law: The Interpretation of Legal Texts* 180 (2012) (stating that "if context and other

28

considerations (including the application of other canons) make it impossible to apply the harmonious-reading canon," the conflict cannot be set aside).

We begin our analysis with the observation that, read independently and in isolation, the plain language of the two provisions directly conflicts. Subdivision 7(a) provides that "[a] copy of the most current personal care assistance care plan is required to be in the recipient's home *and* in the recipient's file at the provider agency," while subdivision 28 states that "[r]equired documentation must be completed and kept in the personal care assistance provider agency file *or* the recipient's home residence." (Emphasis added.) DHS makes no effort to harmonize these provisions. Best Care makes two arguments attempting to harmonize subdivisions 7(a) and 28, neither of which is reasonable.

First, Best Care argues that subdivision 7(a) does not apply to the PCA Choice program and, consequently, subdivision 28 exclusively governs whether Best Care must keep PCA Choice recipient care plans in its files. Best Care's argument rests on several provisions in section 256B.0659. As an initial matter, Best Care points to section 256B.0659, subdivision 18, which authorizes the PCA Choice program.[17] Best

---

[17] Subdivision 18 states:

(a) The commissioner may allow a recipient of personal care assistance services to use a fiscal intermediary to assist the recipient in paying and accounting for medically necessary covered personal care assistance services. ***Unless otherwise provided in this section***, *all other statutory and regulatory provisions relating to personal care assistance services apply to a recipient using the personal care assistance choice option.*
(b) Personal care assistance choice is an option of the personal care assistance program that allows the recipient who receives personal care assistance services to be responsible for the hiring, training, scheduling, and

29

Care focuses on language in this subdivision providing that "[*u*]*nless otherwise provided in this section*, all other statutory and regulatory provisions relating to personal care assistance services apply to a recipient using the personal care assistance choice option." Minn. Stat. § 256B.0659, subd. 18 (emphasis added). Based on this "unless otherwise provided in this section" language, Best Care asserts that section 256B.0659, subdivision 19(a), identifies several duties traditionally assigned to PCA provider agencies that PCA Choice recipients (or their responsible parties) undertake, including, in relevant part, the duty to "develop a personal care assistance care plan."[18] Minn. Stat. § 256B.0659,

---

> firing of personal care assistants . . . . This program offers greater control and choice for the recipient in who provides the personal care assistance service and when the service is scheduled. The recipient or the recipient's responsible party must choose a personal care assistance choice provider agency as a fiscal intermediary. This personal care assistance choice provider agency manages payroll, invoices the state, is responsible for all payroll-related taxes and insurance, and is responsible for providing the consumer training and support in managing the recipient's personal care assistance services.

Minn. Stat. § 256B.0659, subd. 18 (emphasis added).

[18] More fully, subdivision 19(a) provides that the recipient or responsible party under PCA choice shall:

> (1) recruit, hire, schedule, and terminate personal care assistants according to the terms of the written agreement required under subdivision 20, paragraph (a);
> (2) develop a personal care assistance care plan based on the assessed needs and addressing the health and safety of the recipient with the assistance of a qualified professional as needed;
> . . .
> (4) supervise and evaluate the personal care assistant with the qualified professional, who is required to visit the recipient at least every 180 days;

30

subd. 19(a)(2). Under subdivision 19(a)(2), then, one of the tasks for which the PCA

provider agency in the traditional PCA program would be responsible—developing a care

plan—becomes the recipient's responsibility under the PCA Choice option.

Section 256B.0659, subdivision 19(b)–(c), in turn, lists PCA provider agencies'

responsibilities in the PCA Choice program.[19] This list of responsibilities does not

> (5) monitor and verify in writing and report to the personal care assistance choice agency the number of hours worked by the personal care assistant and the qualified professional . . . .

Minn. Stat. § 256B.0659, subd. 19(a).

[19] Subdivision 19(b)(1) requires that the PCA provider agency "meet all personal care assistance provider agency standards." Minn. Stat. § 256B.0659, subd. 19(b)(1). Subdivision 19(c), provides:

> (c) The duties of the personal care assistance choice provider agency are to:
>
> (1) be the employer of the personal care assistant and the qualified professional for employment law and related regulations including but not limited to purchasing and maintaining workers' compensation, unemployment insurance, surety and fidelity bonds, and liability insurance, and submit any or all necessary documentation including but not limited to workers' compensation, unemployment insurance, and labor market data required under section 256B.4912, subdivision 1a;
> (2) bill the medical assistance program for personal care assistance services and qualified professional services;
> . . .
> (4) pay the personal care assistant and qualified professional based on actual hours of services provided;
> . . .
> (6) verify and keep records of hours worked by the personal care assistant and qualified professional;
> (7) make the arrangements and pay taxes and other benefits, if any, and comply with any legal requirements for a Minnesota employer;
> (8) enroll in the medical assistance program as a personal care assistance choice agency; and

expressly include maintaining recipients' care plans in the PCA provider agencies' files.[20] Best Care contends that this omission aligns with the Legislature's intent in creating the PCA Choice program: to afford recipients more choice and independence in directing their care. According to Best Care, it makes sense that the Legislature would impose different recordkeeping requirements on PCA provider agencies for PCA Choice recipients because these recipients have greater responsibilities than those in the traditional PCA program.

According to Best Care, then, subdivision 19 modifies the general requirement that PCA provider agencies maintain recipients' care plans in the PCA provider agencies' files by placing responsibility for developing and keeping care plans on the PCA Choice *recipients* and not requiring PCA provider agencies to maintain those plans in their files. In other words, Best Care argues that, under the PCA Choice option, recipients step into the shoes of PCA provider agencies for purposes of retaining care plans such that subdivision 7(a) does not apply to PCA Choice recipient care plans. And, according to Best Care, that result is fully consistent with the directive in section 256B.0659, subdivision 28, that a care plan be kept in the recipient's home *or* in the PCA provider

---

(9) enter into a written agreement as specified in subdivision 20 before services are provided.

Minn. Stat. § 256B.0659, subd. 19(c).

[20] Best Care notes that PCA provider agencies are expressly required to maintain other documents—specifically "records of hours worked by the personal care assistant and qualified professional" for PCA Choice recipients. Minn. Stat. § 256B.0659, subd. 19(c)(6).

agency's files. Consequently, Best Care argues that subdivision 28 provides the documentation retention rules for the PCA Choice program.

We do not find Best Care's argument reasonable to harmonize the conflicting statutory provisions. We disagree with Best Care's interpretation of the language "[u]nless otherwise provided in this section, all other statutory and regulatory provisions relating to personal care assistance services apply to a *recipient* using the personal care assistance choice option" in subdivision 18(a). Minn. Stat. § 256B.0659, subd. 18(a) (emphasis added). That provision addresses PCA Choice *recipients'* responsibility to comply with "all other statutory and regulatory provisions relating to personal care assistance services" unless the statute says otherwise. *Id.* Subdivision 18(a) says nothing about PCA provider *agencies'* responsibilities.

Furthermore, neither subdivision 18 nor 19 (nor any other provision in the statute) exempts PCA provider agencies from following subdivision 7(a)'s directive to maintain a copy of a recipient's care plan in an agency's files.[21] This is not to conclusively say at this point in our analysis that subdivision 7(a)'s directive that PCA provider agencies maintain care plans in their files prevails over subdivision 28, which provides that care plans may

---

[21]     We observe that a PCA provider agency cannot provide services to a PCA Choice recipient unless the agency and recipient enter into a written agreement before any services begin, and annually thereafter, and that the written agreement must address "documentation requirements including, but not limited to, time sheets, activity records, and the personal care assistance care plan." Minn. Stat. §§ 256B.0659, subds. 19(c)(9), 20(a) (providing that "[b]efore services commence under the personal care assistance choice option, and annually thereafter, the personal care assistance choice provider agency and the recipient or responsible party shall enter into a written agreement"), 20(a)(6) (setting out the documentation requirements for agreements between PCA provider agencies and PCA Choice recipients).

be kept either in a PCA provider agency's files or the recipients' homes—the ultimate question we address in this part of our opinion. Rather, we merely observe that Best Care's suggestion that we ignore the clear directive in subdivision 7(a) because other provisions in the PCA Choice statutes do not expressly require PCA provider agencies to keep copies of PCA Choice care plans in their files—and thereby harmonize the two conflicting statutes—is unsound.[22]

Best Care offers an alternative path to harmonizing section 256B.0659, subdivisions 7(a) and 28. It argues that the section 256B.0659, subdivision 7(a), requirement is limited to care plans "developed by the qualified professional with the recipient and responsible party." Minn. Stat. § 256B.0659, subd. 7(a) (providing that "[e]ach recipient must have a current personal care assistance care plan based on the service

---

[22] We noted earlier that Best Care argues it makes sense for the Legislature to design a program that shifts recordkeeping requirements with the level of responsibility placed on recipients. That is, because recipients have more responsibility when they participate in PCA Choice, it makes sense that they would be responsible for keeping their PCA care plans, whereas in traditional PCA programs, in which recipients have less responsibility, that duty falls to the PCA provider agencies. We note it also makes reasonable policy sense for the Legislature to envision a program in which PCA provider agencies always have copies of care plans in their files. Under the PCA Choice program, PCA provider agencies act as "fiscal intermediaries" for recipients. Minn. Stat. § 256B.0659, subd. 18(b). As a fiscal intermediary, a PCA provider agency "manages payroll, invoices the state, is responsible for all payroll-related taxes and insurance, including premiums for family and medical benefit insurance, and is responsible for providing the consumer training and support in managing the recipient's personal care assistance services." *Id.* Even in this reduced role, PCA provider agencies may need a copy of each recipient's care plan to properly perform their functions. Specifically, PCA provider agencies in PCA Choice are charged with billing DHS, which means submitting claims based on PCA timesheets. These timesheets "must correspond" to PCA care plans. *See id.*, subd. 12(b). If a PCA provider agency does not have a care plan in its files, there is no way for it to ensure that it is charging DHS for authorized services, nor that the timesheets—which are the basis for DHS reimbursement claims—are accurate.

plan in subdivision 6 that is developed by the qualified professional with the recipient and responsible party" and that "[a] copy of the most current personal care assistance care plan is required to be in the recipient's home and in the recipient's file at the provider agency"). Best Care also notes that a "[PCA] care plan" is generally defined in statute as a "written description of personal care assistance services *developed by the personal care assistance provider according to the service plan*." Minn. Stat. § 256B.0659, subd. 1(n) (emphasis added).

Best Care asserts that PCA Choice care plans are not care plans "developed by the qualified professional with the recipient and responsible party." To support this assertion, Best Care points to section 256B.0659, subdivision 19(a)(2), which provides that a PCA Choice care plan is developed and prepared by "the recipient or responsible party . . . with the assistance of a qualified professional as needed." Minn. Stat. § 256B.0659, subd. 19(a)(2). In other words, under the PCA Choice option, PCA Choice recipients— and not PCA provider agencies—develop their care plans using qualified professionals only "as needed." Consequently, Best Care claims that section 256B.0659, subdivision 7(a), does not apply to PCA Choice care plans at all.

We disagree with Best Care that section 256B.0659, subdivision 7(a), is so narrow. Section 256B.0659, subdivision 7(b), sets out the components a care plan must include, and no other provision in the Minnesota Statutes does so. Best Care's narrow definition of "care plan" would apply equally to subdivision 7(b) as to 7(a). *See In re Welfare of Child of K.K.*, 964 N.W.2d 915, 921 (Minn. 2021) (stating that we read statutory provisions in the context of surrounding provisions). Under Best Care's position then, not only would

35

PCA provider agencies be exempt from maintaining PCA Choice care plans in their files, but all PCA Choice care plan content requirements would fall away. Best Care offers no evidence that the Legislature intended that result.

In addition, to the extent that Best Care is arguing that the Legislature intended the document retention requirements in section 256B.0659, subdivision 28, to apply exclusively to the PCA Choice option, we disagree. The language of subdivision 28 does not limit its requirements to PCA provider agencies providing services to PCA Choice recipients. *Ecklund*, 20 N.W.3d at 356 (stating that Legislature's failure to qualify or limit a term suggests that the term should be read without such a limitation). Rather, subdivision 28 applies to documentation requirements for "Personal care assistance provider agenc[ies]." Minn. Stat. § 256B.0659, subd. 28.[23] The Legislature defined "Personal care assistance provider agency" broadly as "a medical assistance enrolled provider that provides or assists with providing personal care assistance services and includes a personal care assistance provider organization, personal care assistance choice agency, class A licensed nursing agency, and Medicare-certified home health agency." Minn. Stat. § 256B.0659, subd. 1(l).

---

[23] The title of the subdivision includes the words "Personal care assistance provider agency." Minn. Stat. § 256B.0659, subd. 28. The title was included in the text of the engrossed bill that the Legislature enacted. Act of May 14, 2009, ch. 79, art. 8, § 31, 2009 Minn. Laws 690, 899 (codified at Minn. Stat. § 256B.0659, subd. 28). Accordingly, we may consider the title when interpreting the statute. *Cf. Buzzell v. Walz*, 974 N.W.2d 256, 264 n.7 (Minn. 2022) (stating that we do not consider headnotes when interpreting statutory text because headnotes are not before the Legislature when it enacts laws).

In summary, we conclude that section 256B.0659, subdivision 7(a), which states that care plans must be kept both in recipients' homes and PCA provider agency files, and section 256B.0659, subdivision 28, which states that care plans must be kept in either a recipient's home or their PCA provider agency's files, cannot be harmonized and, accordingly, irreconcilably conflict.

B.

Because subdivisions 7(a) and 28 irreconcilably conflict and cannot be harmonized, we must resolve the conflict between them. In resolving conflicts between statutory provisions, we have stated that the more specific provision prevails over the more general provision. *Connexus Energy v. Comm'r of Revenue*, 868 N.W.2d 234, 242 (Minn. 2015). This rule is especially strong when—as here—the provisions are closely related and part of the same comprehensive statutory scheme. *Id.* (quoting *HCSC–Laundry v. United States*, 450 U.S. 1, 6 (1981)). Thus, we begin by determining which provision is more specific.

One way to determine which provision is more specific is to evaluate the "specific problem targeted." *Id.* Subdivision 7 addresses care plans specifically; it expressly requires that each PCA care recipient have a care plan, mandates the contents of care plans with particularity, and directs that each PCA provider agencies retain a copy of a recipient's "most current . . . care plan." This suggests that, when enacting subdivision 7(a), the Legislature focused on how *care plans* will most effectively serve their purpose in the statutory scheme. Subdivision 28, on the other hand, targets a more general concern. This subdivision is located in a range of subdivisions within section 256B.0659 that covers PCA

37

provider agency obligations generally, Minn. Stat. § 256B.0659, subds. 21–28, and addresses the general categories of documents PCA provider agencies must "complete." It also directs that PCA provider agencies must keep the completed documents in their files or recipients' homes. The fact that the Legislature chose to use open-ended language in subdivision 28 ("kept in the personal care assistance provider agency file *or* the recipient's home residence") suggests that, in enacting the provision, the Legislature's focus was on ensuring all required documents were "completed and kept," rather than on directing precisely where to keep the documents. Minn. Stat. § 256B.0659, subd. 28(a) (emphasis added).

Additionally, under *Connexus Energy*, we consider the scope of each provision to determine which is the most specific. 868 N.W.2d at 242. Here, subdivision 7 is more specific in scope than subdivision 28; it narrowly focuses on care plans, including where they must be kept. In contrast, subdivision 28 is a catalog of required documentation that must be completed and kept including employee files (subdivision 28(a)(1)), recipient files (subdivision 28(a)(2)), agency policies (subdivision 28(a)(3)), timesheets for each individual PCA (subdivision 28(a)(4)), and marketing and advertising materials (subdivision 28(a)(5)).

Because subdivision 7(a) is the more specific provision, we conclude that PCA provider agencies must follow its requirement and maintain PCA Choice care plans in their files. This conclusion makes sense when one steps back and considers the problem from the perspective of how a person would understand the interaction of similar requirements as a practical matter. In subdivision 28, the Legislature is telling PCA provider agencies

38

that they must complete and keep several categories of documents. It gives PCA provider agencies a choice between two places to keep the documents: in PCA provider agency files or in recipients' homes. In subdivision 7(a), the Legislature tells PCA provider agencies that they must keep one specific type of document—a care plan—in both a PCA provider agency's files and at a recipient's home. The first requirement focuses on the various documents PCA provider agencies must keep, without directing specific locations for every document. The second requirement focuses on one particular document (also covered generally in the first command) and provides a more specific location where that document must be kept. An ordinary person reading these two commands—one general and one specific—would conclude that PCA provider agencies should follow the specific requirement with regard to care plans and keep them in both designated locations.

We will sometimes apply a general provision rather than a more specific provision when the general provision was enacted subsequent to the specific provision and there is clear and objective evidence that the Legislature intended the general provision to prevail over the specific provision. *Nielsen v. 2003 Honda Accord*, 845 N.W.2d 754, 756 (Minn. 2013); *see also* Minn. Stat. § 645.26, subd. 1 (2024) (providing that a general provision prevails over a specific provision if "the general provision shall be enacted at a later session and it shall be the manifest intention of the legislature that such general provision shall prevail"). This exception to the usual rule that a specific provision governs over a conflicting general provision does not apply here. First, section 256B.0659, subdivisions 7(a) and 28, were enacted in their current form in the same 2009 bill that recodified and revised the law governing the personal care attendant program. *See* Act of

39

May 14, 2009, ch. 79, art. 8, § 31, 2009 Minn. Laws 690, 884, 899 (codified as amended at Minn. Stat. § 256B.0659).[24] Second, for the reasons stated earlier, we perceive nothing to suggest that the Legislature intended that subdivision 28's more open-ended requirements for where documents, including care plans, must be kept should apply instead of the specific rule for care plans set forth in subdivision 7(a).

In summary, we hold that, in accordance with section 256B.0659, subdivision 7(a), PCA provider agencies must maintain in their files care plans of all PCA recipients, including PCA Choice recipients, and failure to do so is "abuse" under section 256B.064, subdivision 1a. Accordingly, we affirm the court of appeals' holding that "provider agencies are required to maintain PCA Choice care plans in their service records, and the commissioner did not misapply the law when finding abuse on this basis." *Best Care*, 994 N.W.2d at 344. But for the reasons explained in Part I.B, the court of appeals applied the wrong standard in concluding that "the commissioner exceeded her authority by ordering monetary recovery on this basis." *Id.* We thus include this claim of abuse in our remand to the court of appeals to determine whether, at the time DHS made the disputed payments to Best Care, a statute or valid regulation independent of section 256B.064, subdivision

---

[24] Before the 2009 revision, the personal care attendant program was governed in part by Minnesota Statutes section 256B.0655 (2008). The statute provided that "[i]n order to be paid for [PCA] services" both traditional and PCA Choice provider agencies were required to keep recipient files, including recipients' care plans. *Id.*, subd. 2(f)(1)(iii). It also required "personal care provider organization[s]" to "maintain documentation and a recipient file and satisfy communication requirements in section 256B.0655, subdivision 2, paragraph (f)." *Id.*, subd. 1g(3). It is unclear whether these provisions are predecessors of the current section 256B.0659, subdivision 7(a), or section 256B.0659, subdivision 28. Because, however, the Legislature enacted these subdivisions together in the 2009 recodification and revision, we need not address this issue further.

1a(a), legally prohibited DHS from paying if DHS knew that Best Care was not maintaining care plans for all PCA recipients, including PCA Choice recipients, in its files.

## CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the decision of the court of appeals and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

GAÏTAS, J., took no part in the consideration or decision of this case.

Skip To: [Main Content](#) | [Subnavigation](#) |

 MINNESOTA

CFSS Policy Manual

| DHS Home | PartnerLink Home | Manuals Home |
| Bulletins | Advanced Search |

FSS Policy Manual ☐ Home page ☐ Transition from PCA to CFSS

keyword search...

Find in Table of Contents:

Find in ToC...

Home page
   Manual updates
   **Transition from PCA to CFSS**
   Process overview
Covered personal care services
Eligibility
Services on a waiver/AC
Person's rights and responsibilities
Consultation services
Service delivery plan (care plan)
Personal care workers
Service options
Provider agencies
Financial management services (FMS)
Qualified professionals
Service changes
Resources

# Transition from PCA and CSG to CFSS

**Page updated:** 8/11/25

In October 2024, DHS started the transition from personal care assistance (PCA) and the Consumer Support Grant (CSG) to Community First Services and Supports (CFSS).

This page provides information about the following topics:

- [Why is DHS making this change?](#)
- [What will not change for people using PCA?](#)
- [What will change for people using PCA?](#)
- [What will not change for people using CSG?](#)
- [What will change for people using CSG?](#)
- [Transition plan: Phase I (ended Sept. 30, 2024)](#)
- [Transition plan: Phase II (current phase)](#)
- [Transition plan: Phase III](#)

## Why is DHS making this change?

Federal changes allowed DHS to implement changes that will give people more choice and control of how they use services.

# What will not change for people using PCA?

Many things will stay the same for people using PCA, including, but not limited to:

- Eligibility, as described on CFSS Manual – Eligibility for PCA/CFSS services and CFSS eligibility training.

- Assessment process.

- Covered services for activities of daily living (ADLs), instrumental activities of daily living (IADLs) (including driving), health-related procedures and tasks, observation and redirection of behaviors, as described on CFSS Manual – PCA/CFSS covered services.

- Provider agencies support people in the CFSS agency model.

- The person directs their care, or a representative directs care on the person's behalf.
  **Note:** In PCA, this representative is called the "responsible party (RP)." In CFSS, this representative is called the "participant's representative."

For more information, refer to CFSS roles and responsibilities training.

# What will change for people using PCA?

The following sections provide brief descriptions of what will change for people using PCA. For additional information, refer to CFSS overview training.

## Consultation services providers

CFSS consultation services providers will help a person succeed by ensuring they:

- Understand how CFSS works.

- Can make informed decisions.

- Write a service delivery plan that meets the person's needs and follows program rules.

For more information, refer to CFSS Manual – CFSS consultation services overview, Consultation services provider training and CFSS roles and responsibilities training.

PCA does not include consultation services providers.

## Budget model

The CFSS budget model gives a person more control over employment-related activities.  Financial management services (FMS) providers will support people using the budget model.  For more information, refer to CFSS Manual – PCA service  options and CFSS service models, Agency and budget models training, CFSS math training and CFSS roles and responsibilities training.

PCA does not have a budget model.

## Family members serving as workers

In CFSS, a person's spouse or parent of a minor will be able to provide CFSS services to that person.  DHS recognizes the value of allowing people to receive supports from family members.  For more information, refer to CFSS Manual – Paying  a spouse or parent of a minor for PCA/CFSS services and New potential workers training.

In PCA, a person's spouse or parent of a minor previously was not able to provide PCA services.  However, starting on Oct. 1, 2024, they will be able to provide services.  For more information, refer to the July 30, 2024, eList announcement.

## People using CFSS serving as workers

A person using CFSS will be able to provide CFSS services to other people.  There are many benefits when people who receive services are also able to provide services.  People who receive services have a right to competitive employment opportunities.  Expanding the pool of potential workers benefits everyone who uses these services.

People often ask DHS how it is possible for people who receive services to also provide services.  People who use CFSS have a wide variety of skills and needs. For example, a person might need support eating because of a swallowing disorder, and they are able to provide services to another person who needs support with transfers.  For more information, refer to New potential workers training.

In PCA, a person using PCA cannot serve as a PCA worker for another person.

## Purchase of goods and services

In CFSS, a person will be able to purchase allowable goods and services to replace the need for human assistance and/or give the person more independence and control.  Examples of goods and services include:

- Grabbing tool to help a person get dressed.
- Laundry service.

For a person on the CFSS agency model, a CFSS provider agency will employ their workers, and an FMS provider will support them with purchasing goods and services.

For a person on the CFSS budget model, an FMS provider will support them with purchasing goods and services.

For more information, refer to CFSS Manual – Goods and services through CFSS, Goods, services and personal emergency response systems (PERS) training and CFSS math training.

In PCA, a person is not able to purchase goods and services.

## Purchase of PERS

In CFSS, a person will be able to purchase PERS to help them remain safe while alone in their own home.  For more information, refer to CFSS Manual – CFSS PERS and Goods, services and PERS training.

In PCA, a person is not able to purchase PERS.

## Worker training and development

In CFSS, agencies and people who employ CFSS workers will have a separate, dedicated budget for training about the specific needs of the person the worker supports.  This will give agencies and people who employ workers more flexibility in training workers, and it will allow workers to best serve people's specific needs. When CFSS launches, the worker training and development budget will be $1,272.96 per year.  The rate may change in the future in response to legislation. For more information, refer to CFSS Manual – CFSS worker training and supervision and  Worker training and development training.

In PCA, the qualified professional (QP) is responsible to train and supervise PCA workers. The worker training and development budget replaces QP units.

**Note:** The CFSS agency's supervising professional will still be responsible to train the worker, ensure they are competent and supervise them. However, the qualifications are more flexible, and multiple supervising professionals can work with a person's workers, if appropriate.

For more information, refer to [CFSS roles and responsibilities training](#).

## Eligibility for rating LT

In CFSS, a person who continues to meet the eligibility for the current rating LT will now have the rating P, Q or R and be eligible for at least five units per day. The rating LT will no longer exist in CFSS.

In PCA, a person with the rating LT receives two units per day.

For more information, refer to [CFSS Manual – PCA/CFSS unit determination](#) and [CFSS eligibility training](#).

## Flexibility of dollars/units

In CFSS, a person will have increased flexibility for distributing units/dollars throughout the year. They can choose to distribute units/dollars through their service plan year, unless they are on the Minnesota Restricted Recipient Program (MRRP). For more information, refer to [CFSS Manual – Flexible use of PCA/CFSS services](#).

In PCA, a person has some flexibility for distributing units/dollars, but not as much flexibility as they will have in CFSS. In PCA, a person not on the MRRP can only use up to 75% of their units in each half of the service plan year.

# What will not change for people using CSG?

Many things will stay the same for people using CSG, including, but not limited to:

- Eligibility (if the person is using CSG as an alternative to PCA).
  **Note:** If the person is using CSG as an alternative to home care nursing, the lead agency must offer the person a MnCHOICES assessment and

work with the person on how to meet their needs based on the assessment results.

- Assessment process.

- The person can have a budget, be the employer of their workers and work with an FMS provider if they choose to use the CFSS budget model.

- The person's spouse or parent (if they are a minor) can serve as their support worker.

- The person can purchase allowable goods and services.
  **Note:** There are more restrictions in CFSS for covered goods and services.

For more information, refer to <u>CBSM – CSG transition to CFSS</u>.

# What will change for people using CSG?

The following sections provide brief descriptions of what will change for people using CSG. For additional information, refer to <u>CBSM – CSG transition to CFSS</u>, <u>CFSS</u> <u>transition from CSG training</u> and <u>CFSS overview training</u>.

## Service models

In CFSS, there will be two service models: the budget model and the agency model. A person using CSG may wish to select the budget model to continue being the employer of their workers.

Both CFSS models will include more options than were available in PCA, including paying spouses and parents of minors to provide services and purchasing goods and services.

## Consultation services providers

CFSS consultation services providers will help a person succeed by ensuring they:

- Understand how CFSS works.

- Can make decisions.

- Write a service delivery plan that meets the person's needs and follows program rules.

CSG does not include consultation services providers. In CSG, the lead agency performs the functions of the consultation services provider, if needed.

## Budget

If a person using CSG selects the budget model, their budget will be approximately twice as large as it was before, unless:

- Their eligibility changes.
- They are using CSG to meet their home care nursing needs.

If a person using CSG selects the agency model, they will get service units and work with a provider agency instead of having a budget.

## Purchase of goods and services

A person using CSG is already able to purchase goods and services.

The federal government is helping fund CFSS services, so DHS must align its laws and policies with both state and federal guidelines.  Because of federal guidelines, a person may see some changes to the goods and services that are covered.  Their consultation services provider will help them identify any differences that might affect them.

## Purchase of PERS

In CFSS, a person will be able to purchase PERS to help them remain safe while alone in their own home.

## Worker training and development

In CFSS, agencies and people who employ CFSS workers will have a separate, dedicated budget for training about the specific needs of the person the worker supports.  This will give agencies and people who employ workers more flexibility in training workers, and it will allow workers to best serve people's specific needs.

In the CFSS agency model, the provider agency will be responsible to train the workers.  In the CFSS budget model, the person will be responsible to train the workers.

In CSG, the person is responsible to train the workers.

# Transition plan: Phase I (ended Sept. 30, 2024)

## What did DHS do?

During Phase I, DHS:

- Posted training for workers (April 2020).

- Posted training for current provider agencies (July 2021).

- Contracted with consultation services providers (January 2022).

- Posted online training for consultation services providers (January 2022 and March 2022).

- Started training consultation services providers (February 2022).

- Started providing webinars for consultation services providers (February 2022).

- Submitted an application to the federal government for approval (March 2022).

- Posted training for lead agencies (June 2022).

- Met with managed care organizations (MCOs) about their computer system updates (October 2022).

- Posted DHS – CFSS service agreement and claims codes (October 2022).

- Resubmitted an application to the federal government for approval (November 2023).

- Received final approval of the state plan amendment from the federal government (February 2024).

- Started sharing information about CFSS with people using PCA and CSG and notifying them about the upcoming changes (May 2024).

- Obtained approval for waiver amendments including extended CFSS (June 2024).

- Posted Training for new CFSS provider agencies (July 2024).

- Posted training for FMS providers in TrainLink (July 2024).

- Posted most new forms and documents and added them to CFSS Manual – Forms and documents (July through September 2024).

- Posted CFSS service agreement calculator tools (July 2024).

- Posted the CFSS Policy Manual (August 2024).

- Posted the [Self-paced online course: CFSS MMIS Updates Training](#) (September 2024).

- Began holding office hours with lead agencies and consultation services providers (September 2024).

- Started offering Consultation Services Resources and MN-ITS Training (September 2024).

- Started enrolling provider agencies as CFSS providers.

- Started meeting with MCOs.

- Started enrolling consultation services providers.

## What did people receiving services (PCA or CSG) or their representative need to do?

People receiving services did not need to do anything during Phase I. As of Oct. 1, 2024, lead agencies started giving people information at their reassessment, and consultation services providers started educating people about CFSS.

People receiving services could review [General training on CFSS](#) during Phase I.

## What did lead agencies need to do?

During Phase I, lead agency assessors, case managers and care coordinators:

- Completed "Community First Services and Supports (CFSS) for lead agencies," an online training in [TrainLink](#) (course code CFSS_LA).

- Reviewed the CFSS Policy Manual.

- Reviewed the CFSS MMIS Manual and completed the CFSS MMIS online training if they are involved in MMIS entry.

## What did current PCA provider agencies need to do?

During Phase I, current PCA provider agency owners:

- Completed the online [CFSS transition training and test for PCA agency owners/managers/QPs](#) to continue providing services in CFSS.

- Submitted required paperwork from the CFSS transition training and test to DHS, as described in the email they received upon successful completion of the test.

- Updated their policies, procedures and documents for CFSS.
- Ensured DHS has a PCA/CFSS support workers training certificate for all PCA workers on file before they begin providing CFSS services. PCA workers who completed the test after April 15, 2020, have already met the requirement. For more information, refer to MHCP Provider Manual – Individual PCA or DSW enrollment criteria and forms.

## What did current QPs and designated billing people need to do?

During Phase I, current QPs who will continue to provide training and supervision in CFSS completed the CFSS transition training for PCA agency owners/managers/QPs to continue providing services in CFSS.

## What did current FMS providers need to do?

During Phase I, current FMS providers:

- Completed FMS CFSS training available in TrainLink under course code CFSS_FMS.
- Updated their policies, procedures and documents for CFSS.

## What did current PCA workers need to do?

Current PCA workers did not need to do anything in Phase I, but DHS encouraged them to complete the Personal Care Assistance (PCA) and Community First Services and Supports (CFSS) Training and Test.

Workers who took the test after April 15, 2020, and have a certificate titled "PCA and CFSS Support Worker Training" have already met this training requirement.

Workers who took the test before April 15, 2020, and have a certificate titled "Personal Care Assistant Training" will need to complete the new training before providing services to a person using CFSS.

## What did current CSG workers need to do?

During Phase I, current CSG workers needed to complete the Personal Care Assistance (PCA) and Community First Services and Supports (CFSS) Training and Test and enroll as CFSS workers. The person's provider agency or FMS provider assisted the worker with enrollment.

## What did consultation services providers need to do?

DHS contracted with 22 consultation services providers, as announced in the [March 31, 2022, eList announcement](#). During Phase I, those providers:

- Completed all training required by DHS.

- Enrolled with DHS as consultation services providers.

- Developed policies, procedures and documents.

# Transition plan: Phase II (current phase, 24 months)

DHS started phase II on Oct. 1, 2024. During the transition period, people will transition to CFSS at the time of their assessment. For more information, refer to [CFSS transition process training](#).

## What has DHS done?

DHS completed the following tasks:

- Updated MMIS with CFSS codes before rollout (Sept. 30, 2024).

- Updated MMIS to allow the entry of CFSS service agreements (Sept. 30, 2024).

- Posted [DSD MMIS Reference Guide – MMIS transition from PCA and CSG to CFSS](#) to provide more information about the MMIS transition (Sept. 30, 2024).

- Instructed MCOs to update their authorization systems (September 2024).

- Updated CFSS MMIS training in [TrainLink](#) with additional information (Oct. 1, 2024).

- Added CFSS rates to [DHS – CFSS codes and rates](#) (Oct. 1, 2024).

- Updated most pages in the [DSD MMIS Reference Guide](#) to include CFSS information (October 2024).

- Updated the [SEIU contract compliance training for PCA providers and FMS providers](#) with information about CFSS (October 2024).

- Added CFSS rates to the [Long-Term Services and Supports Service Rates Limits, DHS-3945 (PDF)](#) (November 2024).

- Published [Choosing a CFSS model: A tool for a person using CFSS and their consultation services provider](#) (November 2024).

- Finished enrolling all [CFSS consultation services providers](#) (November 2024).

- Sent the [Nov. 26, 2024, eList announcement](#) to announce that people who currently use PCA/CSG services will receive up to six months of PCA/CSG services while they transition to CFSS.  For additional information, refer to [CFSS Transition Timelines](#).

- Posted [CFSS: Being an Employer](#) (December 2024).

- Began holding office hours with PCA/CFSS provider agencies (January 2025).

- Posted [CFSS Manual – PCA/CFSS personal care time and activity documentation](#) (April 2025).

- Posted [CFSS Manual – PCA/CFSS services on a waiver/AC](#) (May 2025).

- Updated [CDCS Manual – Purchasing PCA/CFSS and home care services under CDCS](#) and posted [CDCS Manual – Resource: CDCS budget impacts when purchasing PCA/CFSS, home care and extended waiver services with instructions on using CFSS on CDCS](#) (June 2025).

- Sent the [July 25, 2025, eList announcement](#) with instructions to avoid a gap in services for people who have not completed the transition to CFSS by their next assessment on or after Oct. 1, 2025.

- Announced a request for proposal (RFP) for interested businesses to apply to become CFSS consultation services providers.  For more information, refer to the [July 29, 2025, eList announcement about the RFP](#).

- Made improvements to MMIS to help counties/tribal nations enter CFSS service agreements faster.  For more information, refer to the [July 29, 2025, eList announcement about MMIS improvements](#).

## What does DHS still need to do?

In phase II, DHS will:

- Continue to meet with MCOs.

- Continue to share information about CFSS with people using PCA and CSG and notify them about the upcoming changes.

- Continue to communicate with all interested parties.

- Post new forms, update remaining forms and add links to [CFSS Manual – Forms and documents](#).

- Edit forms based on feedback, as needed.

- Continue to have all training materials available.

- Provide ongoing support to those who need it.

- Develop further training and communications based on feedback from those who find existing content confusing or difficult.

- Continue to meet with the CFSS Development and Implementation Council.

- Find and fix issues in MMIS.

- Continue to hold regular office hours with lead agencies and consultation services providers.

- Finish enrolling all provider agencies as CFSS providers.

- Post instructions to enter denials, terminations and reductions in the [DSD MMIS Reference Guide](#).

- Find and update references to PCA and CSG in the Community-Based Services Manual (CBSM) and other manuals.

- Post guidance for lead agencies about supporting people with mid-year changes.

- Post calculator tools for changing models (i.e., agency model or budget model) on [CFSS service agreement calculators.](#)

## What do people receiving services (PCA or CSG) or their representative need to do?

After their next assessment, people receiving services will:

- Select a consultation services provider.

- Select a model.

- Select a provider agency and/or FMS provider.

- Write their service delivery plan and submit it for approval.

- Oversee their services (budget model) or work with their provider agency to oversee their services (agency model).

## What do lead agencies need to do?

For people using PCA, lead agencies must:

- Conduct assessments by following the instructions on [CFSS Policy Manual – Assessment for PCA/CFSS services](#).

- Approve people's CFSS service delivery plans by following the instructions on [CFSS Policy Manual – CFSS service delivery plan development and approval process](#).

- Authorize services.  Counties/tribal nations follow the instructions on [DSD MMIS Reference Guide – Type B service agreement for PCA/CFSS](#). MCOs follow their respective authorization systems.

For people using CSG, counties/tribal nations must:

- Conduct assessments by following the instructions on [CBSM – CSG transition to CFSS](#).

- Approve people's CFSS service delivery plans by following the instructions on [CFSS Policy Manual – CFSS service delivery plan development and approval process](#).

- Authorize services. Counties/tribal nations follow the instructions on [DSD MMIS Reference Guide – Type B service agreement for CSG](#).

## What do current PCA provider agencies need to do?

Current PCA provider agencies will continue providing PCA services as long as people are receiving PCA through the agency.  As people transition to CFSS, the provider agency must:

- Enroll as a CFSS provider agency. Refer to [MHCP Provider Manual – CFSS provider agency enrollment criteria and forms](#).

- Ensure all of a person's workers have a PCA/CFSS training certificate on file with DHS before that person begins using CFSS.  PCA workers who complete the test after April 15, 2020, have already met the requirement.  For more information, refer to [MHCP Provider Manual – Individual PCA or DSW enrollment criteria and forms](#).

- Participate in a coordinated transfer of services for any person who chooses the CFSS budget model.

- Comply with requirements for paying out paid time off (PTO), if applicable (for more information, refer to [DHS – PCA Choice and FMS provider information](#)).

- Start offering CFSS services.

## What do FMS providers need to do?

FMS providers must:

- Start offering CFSS FMS services.

- Complete CFSS Financial Management Services Provider Training in [TrainLink](#) (if not already complete).

- Complete a CFSS-specific PCA/CFSS agency resource and MN–ITS training.

## What do consultation services providers need to do?

Consultation services providers must:

- Start offering consultation services.

- Complete CFSS Consultation Services Provider Training in [TrainLink](#) (if not already complete).

- Help people write service delivery plans for six months of services.

- Submit service delivery plans to lead agencies through MnCHOICES.

- Attend DHS' office hours.

## What do current workers need to do?

PCA workers must:

- Take the [Personal Care Assistance (PCA) and Community First Services and Supports (CFSS) Training and Test](#) before providing CFSS services.
  **Note:** Workers who completed the training and test after April 15, 2020, have already completed this requirement.

- Receive training from the employer about any changes in the person's plan and/or needs.

# Transition plan: Phase III

In phase III, DHS will discontinue PCA and CSG services after all people have transitioned to CFSS. To do this, DHS will:

- Update statute and waiver plans.

- Update MMIS.

- Send reminders to providers.

- Sunset PCA/CSG legislative language.

- Remove any transitional trainings.

- Remove references to PCA and CSG from the CFSS Policy Manual and DSD MMIS Reference Guide.

- Continue supporting providers and lead agencies.

[+] **Report this page**